# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### ROCK ISLAND DIVISION

| | | |
|---|---|---|
| KAREN MARIE BUCHHOLZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  08-cv-4042 |
| | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## O R D E R  &  O P I N I O N

This matter is before the Court on Plaintiff's Motion for Summary Reversal (Doc. 12) and Defendant's Motion for Summary Affirmance (Doc. 13).  Plaintiff asks this Court to review, pursuant to 42 U.S.C. § 405(g), the Commissioner of Social Security's determination that she is not disabled within the meaning of the Social Security Act and that she is not eligible for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act.  Also pending is Plaintiff's Motion for Leave to File Additional Information (Doc. 15).  For the reasons stated below, Plaintiff's Motion for Summary Reversal is denied, and Defendant's Motion for Summary Affirmance is granted.  Moreover, Plaintiff's Motion for Leave to File Additional Information is denied.

BACKGROUND

## I.     Procedural History

On June 28, 2005, Plaintiff filed applications for Disability Insurance Benefits and Supplemental Security Income, alleging that she became disabled on that date. (Tr. 82, 85). Her applications were denied; Plaintiff filed for reconsideration of the denials, which were subsequently affirmed. (Tr. 25-26, 35, 43-46). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on March 27, 2008. (Tr. 40). The ALJ found that Plaintiff was not disabled on April 9, 2008. (Tr. 13-24). On June 27, 2008, the Appeals Council denied review of the ALJ's decision. (Tr. 4-6).

## II.     Relevant Medical History

### A.     Physical Concerns

On November 29, 2006, Plaintiff underwent an X-ray of her lumbar spine, on the order of Dr. John Johnson, her primary care physician, which showed moderate disc space narrowing, no abnormal bone lesion, and well-preserved disc spaces. (Tr. 279). Dr. Johnson saw Plaintiff on December 14, 2006, and found that she had a history of schizophrenia and arthritis, though her physical examination showed no abnormalities. (Tr. 277). On December 31, 2006, Dr. Johnson also filled out a form to allow Plaintiff to receive a reduced bus fare, as she had difficulty walking and boarding a bus.[1]  (Tr. 273-76). To accompany this form,[2] he made a note on

---

[1]     Portions of this form were also included in the transcript at Tr. 374-75. In addition, a dictionary entry for paranoid schizophrenia has been photocopied onto the same page and labeled with Plaintiff's social security number. (Tr. 375).

December 31, 2006 stating that "patient has degenerative joint disease schizophrenia paranoid fibromyalgia." (Tr. 272). Dr. Johnson saw Plaintiff again on January 18, 2007. He noted that Plaintiff was seeking more pain medication for her lower back, and that she gave inconsistent answers as to whether her current pain medication was effective. (Tr. 271).

On March 1, 2007, Dr. Johnson found that Plaintiff's blood pressure was extremely high, and decided to slowly discontinue Plaintiff's Lyrica medication in order to see if that is what caused the hypertension; he ordered an EKG and chest X-ray. (Tr. 268). The chest X-ray showed that Plaintiff's lungs were clear and that her cardiomediastinal silhouette and pulmonary vessels were within normal limits. It also showed that Plaintiff had a slight spinal curvature. (Tr. 267). Dr. Johnson found on March 12, 2007, that Plaintiff's lab work showed hyperlipidemia, for which he prescribed a heart healthy diet; he also prescribed medication for hypertension and arthritis of the spine. (Tr. 266). He noted that Plaintiff reported her back pain to be about a 7 out of 10, and that it was a dull ache which was worsened by long walks or lifting. (Tr. 266). As he had also previously reported, Dr. Johnson again noted Plaintiff's past medical history of psychological problems, schizophrenia, hypertension, hyperlipidemia, degenerative joint disease, and menopause. (Tr. 266). On the 30th of March, 2007, Plaintiff saw Dr. Johnson. (Tr. 265). There were no changes from the previous visit, except that Plaintiff had stopped taking all of

---

[2]    It appears that this note was written to accompany Plaintiff's application for a reduced bus fare, as the bus-fare form asks the doctor to attach a statement describing why the applicant is eligible for the reduced fare on his letterhead or prescription blank, and as both of these documents are dated December 31, 2006.

her medications except the anxiety medication; Plaintiff had no complaints.  (Tr. 265).

Dr. Johnson saw Plaintiff again on June 27, 2007.  Plaintiff asked Dr. Johnson for Lyrica, which she had heard advertised for fibromyalgia.  Dr. Johnson explained that Plaintiff had previously been on Lyrica for her arthritis[3] and did not like the medication.  (Tr. 264).  He also noted that Plaintiff was very non-compliant with her medications, stopping all medications on her own, becoming paranoid.  (Tr. 264).  On September 28, 2007, Plaintiff saw Dr. Johnson for a hypertension follow-up, at which he noted that she was taking medications for anxiety, depression, and menopause.  (Tr. 263).

In November 2007, Plaintiff met with Dr. Johnson, requesting medication for the pain she had had in her knee and foot for about two months.  Dr. Johnson ordered the medication, as well as an X-ray of her knee and foot, which showed no injury to her foot, and a "possibly evolving bone infarct" of the left knee's distal femur.  (Tr. 261-62).  Plaintiff reported to Dr. Johnson on November 30, 2007 that the medication he prescribed for her foot, leg, and knee was effective.  (Tr. 260).  By January 11, 2008, though, Plaintiff had stopped taking all of her medications.  She complained to Dr. Johnson of left shoulder pain for the last ten years, for which he ordered an X-ray.  (Tr. 258).  This X-ray revealed no fracture or dislocation, though an MRI was recommended as there was an area of rarefaction within the humeral head.  (Tr. 259).  On February 1, 2008, Dr. Johnson noted on a prescription pad that

---

[3]     See Tr. 277, 271, and 268.

Plaintiff had an abnormal left shoulder X-ray, and that she should have an MRI and consultation with an orthopedic specialist. (Tr. 257).

On January 14, 2008, Plaintiff went to the emergency room with low back pain. (Tr. 284-85). The emergency room doctor's record shows that Plaintiff's pain began with a recent injury caused by sneezing. (Tr. 291). She reported that her pain level was 10 out of 10. (Tr. 287). A physical exam showed full range of motion in Plaintiff's extremities, but a limited range of motion and tenderness in her back, as well as pain on raising her legs. (Tr. 292).

### B.   Mental Health Concerns

Plaintiff sought treatment at the Robert Young Center, which is a mental health center, on September 29, 2005 for stress and anxiety. (Tr. 346-53). She was initially diagnosed with a delusional disorder, and the interviewer noted paranoid ideation. (Tr. 347, 351). In addition, Plaintiff was given a score of 45 on the Global Assessment of Functioning ("GAF") scale,[4] which corresponds to serious symptoms, and was assessed with a severe level of impairment in functioning. (Tr. 347-48).

On October 27, 2005, Plaintiff again visited the Robert Young Center, and was seen by Dr. Ralph Saintfort. (Tr. 343-45). Plaintiff reported feeling intense anxiety, primarily about her ex-husband and her unemployment, though she

---

[4]    Defendant explains that the "GAF scale reports a clinician's judgment of an individual's overall level of functioning, and is used in planning, measuring the impact, and predicting the outcome of treatment." (Doc. 14 at 3 fn. 3) (citing DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-34 (4th ed. 2000). "GAF scores from 41-50 indicate serious symptoms or impairments…GAF scores from 51-60 indicate moderate symptoms, and scores from 61-70 indicate some mild symptoms." (Doc. 14 at 3 fn 3) (citing DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-34).

demonstrated intact reality testing when probed about possible worrisome situations. (Tr. 345-46). Dr. Saintfort noted that Plaintiff had no prior psychiatric history; he diagnosed generalized anxiety disorder and panic attacks without agoraphobia, and gave Plaintiff a GAF score of 55-60, which indicates moderate symptoms. (Tr. 343, 345).

Plaintiff gave a good report to Jan Willis, a counselor at the Robert Young Center, who noted a diagnosis of generalized anxiety disorder and a provisional diagnosis of delusional disorder. (Tr. 342). During a visit on December 8, 2005, Plaintiff stated that she was not moving forward or backward, but felt anxious and jumped from task to task through the day. (Tr. 341). On December 12, 2005, Plaintiff reported to Dr. Saintfort that she had had no recurring anxiety or panic attacks, was sleeping well, had been less frantic, and had no paranoia. (Tr. 340).

Plaintiff again met with Ms. Willis on January 4, 2006, at which meeting Ms. Willis noted that Plaintiff was mildly anxious and that her thinking was delusional. She also noted that Plaintiff went for a five-block walk every day, read, went to the library, and did word searches, though she had to stand up every ten minutes. (Tr. 339). An Individual Treatment Plan was approved by Dr. Saintfort for Plaintiff on January 11, 2006, in which it was noted that she had generalized anxiety disorder, and that delusional disorder should be ruled out. (Tr. 337-38). In addition, Plaintiff was assessed at a GAF level of 60, which indicates moderate to mild symptoms. (Tr. 338). On that same date, Plaintiff was asked about some of the comments made to Ms. Willis that had led Ms. Willis to speculate that Plaintiff was delusional;

Plaintiff explained that her comments were misunderstood. The evaluator found that Plaintiff showed intact reality testing, and was calm, organized, and well-related. (Tr. 336).

Plaintiff visited the Robert Young Center again on January 19, 2007, at which time a Diagnostic Assessment Update was completed. (Tr. 331-34). Plaintiff reported that she did not like either Dr. Saintfort or Ms. Willis, and was seeking a new doctor. (Tr. 334). No diagnosis change was indicated: Plaintiff was still diagnosed with generalized anxiety disorder. (Tr. 334). Plaintiff showed agitated activity, a depressed and anxious mood, and agitated behavior, and was normal on other mental status observations. (Tr. 333). Plaintiff was concerned that people that she formerly knew from her work in mental health would see her at the Robert Young Center. (Tr. 332-34). In addition, a new Individual Treatment Plan was prepared on January 29, 2009, in which diagnoses of generalized anxiety disorder and panic disorder without agoraphobia were noted. The objective of Plaintiff's treatment was to reduce her anxiety from a 6 out of 10 to a 2 out of 10. (Tr. 328-29).

Dr. Ernest Galbreath saw Plaintiff on March 21, 2007, at which she reported having anxiety attacks. (Tr. 326-27). On May 23, 2007, Plaintiff met with Dr. Galbreath, who reported that Plaintiff's anxiety was reduced and that she had had no panic attacks since the last visit; she also expressed no feelings of self harm or suicidal thoughts. (Tr. 321). On August 11, 2007, a modified Individual Treatment Plan was prepared for Plaintiff, in which her generalized anxiety disorder and panic disorder were noted, as was her GAF score of 52. (Tr. 319-20).

On August 15, 2007, Plaintiff met with Dr. Todd Pogue at the Robert Young Center for a medication evaluation. (Tr. 317-18). Dr. Pogue noted that Plaintiff complained that other doctors have labeled her a "paranoid schizophrenic" in the past, and that these records were removed from her files. Plaintiff stated she felt she only had anxiety and not paranoid schizophrenia. (Tr. 318). Plaintiff denied hallucinations and paranoid or delusional thoughts. (Tr. 318). Dr. Pogue again met with Plaintiff on August 21, 2007, at which meeting Dr. Pogue discontinued Plaintiff's existing medication, as she appeared to be allergic to it; Dr. Pogue planned to start a new medication in its place. (Tr. 315-16). On September 11, 2007, Dr. Pogue increased the dosage of Plaintiff's new medication, which had been helpful to her. (Tr. 313-14). He assessed Plaintiff with generalized anxiety disorder, panic disorder, and post-traumatic stress disorder. (Tr. 314).

On October 10, 2007, Dr. Pogue signed off on a new Individual Treatment Plan, which listed diagnoses of panic disorder and generalized anxiety disorder, and assessed Plaintiff's GAF level at 52, which indicates moderate symptoms. (Tr. 312). On October 3 and October 31, 2007, Dr. Pogue found that the new medication was effective for Plaintiff; he reported the assessments of generalized anxiety disorder, panic disorder, and post-traumatic stress disorder. (Tr. 309-10). On these dates, Dr. Pogue gave Plaintiff GAF scores of 61-63, which indicate mild symptoms. (Tr. 309-10).

On November 5, 2007, Carla Mohr completed a Diagnostic Annual Re-Assessment of Plaintiff. (Tr. 302-08). In this assessment, Ms. Mohr noted that

Plaintiff was being treated for anxiety that had resulted in panic attacks. She also noted that Plaintiff had a history of severe abuse as a child and an adult, and had had flashbacks, nightmares, paranoia, and extreme fear. Ms. Mohr found that all of these symptoms had gone into remission, and that Plaintiff was trying to become more social and interact with the world. In addition, she noted that Plaintiff continued to try to obtain disability benefits, as Plaintiff did not think that she could work. (Tr. 308). Plaintiff had paranoia about crowds and about encountering her ex-husband. (Tr. 307). Plaintiff was given a GAF score of 65, which indicates mild symptoms. (Tr. 302).

Plaintiff met with Dr. Pogue on December 20, 2007, and he noted that her therapy was going well and that Plaintiff's medication worked well when she was able to purchase it. (Tr. 301). He signed off on an Individual Treatment Plan on that date, as well, in which he noted that Plaintiff had been diagnosed with generalized anxiety disorder and panic disorder. In addition, a treatment goal of reducing Plaintiff's anxiety from 3 to 1 on a scale 1 to 10 was set, and Plaintiff's GAF was assessed at 65, which indicates mild symptoms. (Tr. 299-300).

On February 12 and 26, 2008, Plaintiff met with Ms. Mohr. (Tr. 295, 297). Ms Mohr noted on February 12 that Plaintiff has been able to keep her anxiety under control. (Tr. 297). On February 26, Plaintiff was anxious. (Tr. 295). On that date, Plaintiff also met with Dr. Eric Ritterhoff of the Robert Young Center, and asked to change doctors. (Tr. 296). Dr. Ritterhoff noted that Plaintiff suffered from anxiety, and that she reported that none of the anxiety medications she has used

have been effective.  (Tr. 296).  Dr. Ritterhoff later wrote[5] that Plaintiff had bipolar disorder manic type, no psychotic symptoms, generalized anxiety disorder.  (Tr. 355-56).  In addition, he noted Plaintiff was considerably calmer and not showing any acute manic symptoms, though she would remain prone to anxiety.  (Tr. 355-56).

## III.   Hearing Testimony

On March 27, 2008, ALJ Alice Jordan held a hearing on Plaintiff's application for benefits.   (Tr. 376-409).   Plaintiff was represented by an attorney, John Westensee, at this hearing.  (Tr. 378).  Plaintiff testified that she felt she could not work as a result of her pain.  (Tr. 386-87, 394).  In addition, she stated that her anxiety problems contributed to her decision to stop working, though the main reason she felt she could not work was because of her pain.  (Tr. 394, 399).

Plaintiff stated that she had pain in her legs, back, hips, arms, hands, and shoulder.  (Tr. 387).  She also stated that her hands and toes go numb.  (Tr. 387).  Plaintiff stated that should could not pick up coins from a table or button her shirt. (Tr. 387).  Plaintiff claimed at the hearing to have fibromyalgia, arthritis, and a herniated disc in her back.  (Tr. 387-88).  She said that her pain medication dulls the pain somewhat, but not enough to make a difference.  (Tr. 395).

In addition, Plaintiff noted that she took medication for anxiety.  (Tr. 388). She said that she worried about everything.  (Tr. 395-96, 400).  Daily decision-making was a struggle.  (Tr. 395-96).  Plaintiff stated that she felt overwhelmed

---

[5]    This writing, signed by Dr. Ritterhoff, was submitted to the ALJ by Plaintiff's attorney just prior to Plaintiff's hearing.  The FAX cover sheet accompanying the writing states that it is related to an appointment Plaintiff had with him on March 26, 2008.  A prescription-pad note signed by Dr. Ritterhoff, dated March 26, 2008, was also included.  (Tr. 358).

often, including during the hearing. (Tr. 396, 400). When she was working, Plaintiff worried all the time about her work. (Tr. 397-98). In response to a question from her attorney, Plaintiff agreed that she sometimes felt that people were against her, including the Robert Young Center, her doctors, and the Social Security Administration. (Tr. 399).

Plaintiff testified that she could perform certain activities: she could wash dishes, do laundry, and cook. (Tr. 388-89). However, Plaintiff stated that she could not vacuum or sweep, that television and reading sometimes overwhelmed her, and that a friend helps her to get groceries because she cannot push a grocery cart. (Tr. 389-90). Plaintiff stated that she could not lift anything, not even a can of soup, but she then explained that she could put a can on the counter and operate a can opener. (Tr. 390, 392). She stated that she had problems with pain in her hands, which a doctor believed was due to her back injury.[6] (Tr. 390-91). Plaintiff testified that she could sit for about three minutes at a time, and would then have to stand up. (Tr. 391). Plaintiff noted that she could walk about a half-block. (Tr. 391).

Plaintiff had formerly worked as a cashier, which required her to lift heavy containers. (Tr. 400-01). She had also previously worked as a waitress, in the laundries at a nursing home and a hotel, and as a maid at a motel. (Tr. 386, 401). For the last twenty years, Plaintiff had worked as a CNA at nursing homes. (Tr. 387). From 1998 until 2001, Plaintiff worked at Oak Glen nursing home; in 2001

---

[6]    This back injury occurred in 2001 and was the subject of a 2002 or 2003 workers' compensation settlement, and the doctor mentioned appears to have been Plaintiff's doctor during that time. (Tr. 381-84, 390-91, 393). Plaintiff held two other jobs after this injury and worker's compensation settlement before she applied for disability benefits and quit working. (Tr. 385-86, 393).

she injured her back while lifting patients.  (Tr. 382).  After her back injury at Oak Glen, Plaintiff was assigned to light duty work; however, she was later laid off because Oak Glen no longer had sufficient light duty work for her.[7]  (Tr. 401-02). Plaintiff returned to work in 2002; she worked at Transitions, a mental rehabilitation facility, for about three years.  (Tr. 385-86).  Plaintiff then worked at New Choices, which cared for mentally handicapped persons in their homes.  (Tr. 385).  Plaintiff quit from New Choices in August of 2005.  (Tr. 385).

Brian Paprocki, a vocational expert, also testified at Plaintiff's hearing.  (Tr. 378, 403-408).  The ALJ asked him whether a person with Plaintiff's work history, who needed an unskilled sedentary job that allowed for the ability to sit or stand at will, with occasional postural limitations, and only occasional interactions with the public and co-workers, could return to her past work.  Mr. Paprocki stated that there were no jobs from Plaintiff's past work that would meet these requirements. (Tr. 405).  He also noted that there were no light-exertion jobs from her past work that would allow Plaintiff to change position as often as she needed to.  (Tr. 406).

After establishing that Plaintiff could not return to her past work, and that she had no transferable skills that would allow for the frequent changes of position she needed, Mr. Paprocki explained what jobs were available in the Illinois and national economy that met Plaintiff's needs, including her need to change positions between sitting and standing.  (Tr. 406-07).  Jobs were available as an addresser or a document preparer, which were sedentary and unskilled, and as a plumbing

---

[7]      This injury resulted in a worker's compensation claim settlement.  (Tr. 382-83).

12

hardware assembler or a small parts assembler, which were light and unskilled. (Tr. 406-07). He also noted that the job of surveillance system monitor would be appropriate. (Tr. 407).

Plaintiff's attorney then posed a set of hypothetical questions to Mr. Paprocki. (Tr. 408). Mr. Paprocki stated that all of the jobs except the surveillance monitoring job would be eliminated if a person could not do repetitive grasping or gripping with her hands. (Tr. 408). He also said that two absences a month was the maximum that most employers would tolerate on an ongoing basis. (Tr. 408). In addition, all employment would be eliminated for a person who needed to take a break of ten to thirty minutes five to eight times per day. (Tr. 408). Finally, if a person lost focus or concentration more than two or three times in an eight-hour period, she could not hold the surveillance monitoring job. (Tr. 408).

## V.  ALJ's Decision

The ALJ issued her decision on April 9, 2008. (Tr. 13-24). She first determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability. (Tr. 15). She then found that Plaintiff had generalized anxiety disorder, panic disorder without agoraphobia, arthritis of the spine, and arthritis of the left knee, which constituted a severe combination of impairments. (Tr. 15).

Next, the ALJ found that Plaintiff's difficulties did not meet any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 that would automatically render her disabled. (Tr. 16-18). Listing 1.02, "Major dysfunction of

a joint due to any cause" did not apply because there was no evidence in the medical record to suggest that Plaintiff suffered a limitation of motion, gross anatomical deformity, inability to ambulate, or inability to perform motor movements.  (Tr. 16). Listing 1.04, "Disorders of the spine," similarly did not apply because there was no evidence in the medical record that there had been compromise to Plaintiff's nerve root or spinal cord resulting in the listed limitations.  (Tr. 16-17).  Finally, Plaintiff's anxiety did not meet the criteria of Listing 12.06, "Anxiety related disorders."  (Tr. 17).  A claimant has met Listing 12.06 when she has certain medically documented findings in conjunction with the limitations listed in either paragraph B or paragraph C.  The ALJ found that paragraph B was inapplicable, as Plaintiff had only mild restrictions in her ability to perform the activities of daily living, only moderate difficulties in social functioning, and only moderate difficulties with concentration, persistence, and pace.  (Tr. 17).  Further, Plaintiff had no repeated episodes of decompensation.  (Tr. 17).  Finally, the ALJ found that paragraph C did not apply.[8]  (Tr. 17).

---

[8]     Though Plaintiff does not mention it, the ALJ appears to have stated an incorrect standard for the paragraph C criteria.  Under Appendix 1, Listing 12.06, paragraph C, the claimant's impairments need to cause a "complete inability to function independently outside the area of one's home."  The ALJ stated that under paragraph C, "the claimant must have a medically documented history of a chronic mental disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: repeated episodes of decompensation, each of extended duration; or a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement."

After determining that none of the listings applied to Plaintiff, and considering the evidence in the record, the ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) & 416.967(b).  The ALJ found that this RFC included several further limitations: only occasional climbing, bending, stooping, crouching, crawling, or kneeling; only unskilled work; and only occasional contact with co-workers or the public.  (Tr. 18).  This RFC was based on Plaintiff's medical records and her testimony, from which the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce the symptoms that Plaintiff alleged, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms was not credible.  (Tr. 19).

After finding this RFC, the ALJ determined that Plaintiff could not return to her past relevant work as a nurse's aid, cashier, mental health technician, or waitress.  (Tr. 22).  She noted that the fact that Plaintiff had no transferable job skills does not require a finding of disability under 20 C.F.R. part 404, Subpart P, Appendix 2, § 201.00(h)(1), because Plaintiff is not restricted to sedentary work and

_____

Though this appears to be an erroneous statement, the Court finds that it was harmless, as Plaintiff's impairments clearly do not cause a "complete inability to function independently outside the area of one's home," and so paragraph C's requirement would not be met.  Indeed, the introduction to the "Mental disorders" listings notes that paragraph C "reflects the uniqueness of agoraphobia," which has been consistently, and explicitly, excluded from Plaintiff's diagnoses.  Listing 12.00(F).  There is substantial evidence in the record that Plaintiff travels outside her home to shop and to visit the doctor.  A correct statement of the listing would not have changed the outcome of the ALJ's five-step analysis.  See Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003) (harmless error doctrine applicable to Social Security appeals); Bacidore v. Barnhart, 01-c-4874, 2002 WL 1906667, *10 (N.D. Ill. Aug. 19, 2002) ("Harmless errors are those that do not affect an ALJ's determination that a claimant is not entitled to benefits.").

can read and write in English. (Tr. 23). Because Plaintiff's ability to perform light work was impeded by additional limitations, the ALJ relied on the Vocational Expert's testimony, which was consistent with the information in the Dictionary of Occupational Titles, that there were jobs available in the Illinois and national economy that Plaintiff could perform: addresser/document preparer (4,000 jobs in Illinois and 250,000 nationally); hardware assembler/document preparer at the sedentary level (40,000 jobs in Illinois and 500,000 nationally); and surveillance system monitor at the sedentary level (2,500 jobs in Illinois and 40,000 nationally). (Tr. 23).

## DISCUSSION

### I.    Legal Standard

To be entitled to disability benefits under the Social Security Act, a claimant must prove that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). To determine if the claimant is unable to engage in any substantial gainful activity, the Commissioner of Social Security engages in a factual determination. See McNeil v. Califano, 614 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; see also Maggard v. Apfel, 167 F.3d 376, 378 (7th Cir. 1999).

In the first step, a threshold determination is made to decide whether the claimant is presently involved in a substantially gainful activity. 20 C.F.R. §§ 404.1520(a)(i), 416.920(a)(i). If the claimant is not under such employment, the

Commissioner of Social Security proceeds to the next step.  At the second step, the Commissioner evaluates the severity and duration of the impairment.  20 C.F.R. §§ 404.1520(a)(iii), 416.920(a)(iii).  If the claimant has an impairment that significantly limits his physical or mental ability to do basic work activities, the Commissioner will proceed to the next step.  At the third step, the Commissioner compares the claimant's impairments to a list of impairments considered severe enough to preclude any gainful work; and, if the elements on the list are met or equaled, he declares the claimant eligible for benefits.  20 C.F.R. §§ 404.1520(a)(iv), 416.920(a)(iv).  If the claimant does not qualify under one of the listed impairments, the Commissioner proceeds to the fourth and fifth steps.  At the fourth step, the claimant's RFC is evaluated to determine whether the claimant can pursue his past work.  20 C.F.R. §§ 404.1520(a)(iv), 416.920(a)(iv).  If he cannot, then, at step five, the Commissioner evaluates the claimant's ability to perform other work available in the economy.  20 C.F.R. §§ 404.1520(a)(v), 416.920(a)(v).

Once a case reaches a federal district court, the court's review is governed by 42 U.S.C. § 405(g), which provides, in relevant part, "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion."  Maggard, 167 F.3d at 379 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  The claimant has the burden to prove disability through step four of the analysis, i.e., he must demonstrate an impairment that is of sufficient severity to preclude him from

pursuing his past work.  <u>McNeil</u>, 614 F.2d at 145.  However, once the claimant shows an inability to perform his past work, the burden shifts to the Commissioner, at step five, to show the claimant is able to engage in some other type of substantial gainful employment.  <u>Id</u>.

## II.  Analysis

Plaintiff, who is appealing the Commissioner's decision *pro se*, submitted a two-page document as her Motion for Summary Reversal.  (Doc. 12).  She appears to make several arguments concerning the ALJ's decision: (1) the hearing was unfair, (2) the ALJ failed to consider certain evidence in the record, and (3) the ALJ failed to consider all of Plaintiff's diagnoses.[9]  (Doc. 12 at 1-2).  In addition, Plaintiff has submitted several documents that were not submitted before the hearing, which are construed as a request for a remand based on new evidence.

---

[9]    Plaintiff writes, "There was an error in the law!"  (Doc. 12 at 1).  However, she does not indicate what this error was, or attempt to refer to any legal authority. Local Rule 8.1(D) provides, in pertinent part:

> [T]he plaintiff shall file a Motion for Summary Judgment and a Memorandum of Law which shall state with particularity which findings of the Commissioner are contrary to law.  The plaintiff shall identify the statute, regulation or case law under which the Commissioner allegedly erred.  The plaintiff shall cite to the record by page number the factual evidence which supports the plaintiff's position.  Arguing generally, "the decision of the Commissioner is not supported by substantial evidence" is <u>not</u> sufficient to meet this rule.

(emphasis in original).  Though *pro se* plaintiffs are allowed some latitude in prosecuting their cases, it is not the Court's function to make a plaintiff's argument for her.

A.      **ALJ's Decision**

1.      **Fairness of the Hearing**

Plaintiff states that "[t]here was nothing fair about this hearing." (Doc. 12 at 1). She claims that she was led to believe that the ALJ was going to rule in her favor, that the ALJ was upset with her for not being able to remember certain information, and that she was discriminated against because of her age, ethnicity, and sex. (Doc. 12 at 1-2). There is no indication in the transcript that the ALJ indicated how she would rule, nor that such an indication would mean that the hearing was unfair. In addition, there is no suggestion in the transcript that the ALJ was frustrated or upset with Plaintiff -- the ALJ did not appear to depart from a professional level of courtesy at any point. Though Plaintiff states that her anxiety level increased while she was in the hearing, the record does not show that she failed to give sufficient testimony or was otherwise impaired, beyond occasionally stumbling over words or details. There is no evidence that Plaintiff was in any way prejudiced by her feeling of anxiety. Further, Plaintiff was represented by an attorney at the hearing, who adequately elicited testimony from Plaintiff and examined the Vocational Expert. Finally, there is no evidence whatsoever that Plaintiff was discriminated against because of her age, sex, or ethnicity. There is no evidence that the hearing before the ALJ was unfair.

2.      **Whether the ALJ Properly Considered Record Evidence**

Plaintiff cites several medical records in the transcript that date from 2000 and 2001. (Doc. 12 at 1-2) (citing Tr. 199, 229, 241, 243). Some of these documents

indeed seem to indicate doctors' impressions that Plaintiff could not work, or would be limited in her ability to work. (Tr. 229, 241). However, they are dated from 2000 and 2001, around the time of Plaintiff's job-related back injury and worker's compensation claim, and are thus not relevant to this Court's review of Plaintiff's allegation of disability between the alleged onset date of June 28, 2005 and the Appeals Council's June 27, 2008 denial of review of the ALJ's decision.

Plaintiff also cites other pages from the transcript, and appears to argue that the ALJ did not properly consider them. None of these pages shows that the ALJ committed an error that entitles Plaintiff to a remand. First is a form entitled "Request for State Agency Medical Consultant Advice," which was completed in September 2005. (Tr. 254-55). This document indicates that Plaintiff has no functional restrictions, and that the previous state agency assessment was affirmed. (Tr. 255). It does not weigh in favor of Plaintiff's contention that she is disabled, and thus cannot indicate error on the part of the ALJ.

Next, Plaintiff cites a February 1, 2008 prescription-pad note from Dr. Johnson, which indicates that Plaintiff had an abnormal left shoulder X-ray. (Tr. 257). The ALJ acknowledged Plaintiff's shoulder X-ray and its findings in her decision, and determined that Plaintiff's alleged shoulder pain was not a severe impairment, as the X-ray of the shoulder had not been definitive, no treatment was made, and Plaintiff did not complain about it after the X-ray. (Tr. 15-16). A credibility determination made by the ALJ will not be disturbed unless the finding

is clearly erroneous.  See Imani v. Heckler, 797 F.2d 508, 510 (7th Cir. 1986).  The Court will not disturb the ALJ's credibility finding here.

Further, Plaintiff cites a November 30, 2007 appointment she had with Dr. Johnson, at which he noted that she had had X-rays of her knee and foot, which showed a possible bone infarct of the distal femur.  (Tr. 260).  Dr. Johnson's note did not indicate what effect this possible bone infarct might have on Plaintiff's abilities. Though she found that Plaintiff did have arthritis of the knee, the ALJ determined that Plaintiff's allegations of disabling pain were not credible.  As noted above, a credibility determination made by the ALJ will not be disturbed unless the finding is clearly erroneous.  Here, the finding is not clearly erroneous, as at this same appointment, Plaintiff reported to Dr. Johnson that the medication he gave her for the pain in her foot, leg, and knee was effective, which was noted by the ALJ.  (Tr. 20).

Plaintiff cites a prescription-pad note from Dr. Johnson dated December 31, 2006, which states that Plaintiff has degenerative joint disease, schizophrenia - paranoid, and fibromyalgia.[10]  (Tr. 272).  The ALJ explicitly considered this

---

[10]    As noted above, it appears that this note was written to accompany Plaintiff's application for a reduced bus fare, discussed below.  Plaintiff also cites the transcript at page 370, which includes a photocopied version of the same December 31, 2006 prescription-pad note.

The other record on page 370 was a note concerning Plaintiff's therapy appointment with Ms. Willis on January 4, 2006.  As noted above, Plaintiff was asked on January 11, 2006 about her "delusional" thinking at the January 4 meeting, Plaintiff explained that her comments were misunderstood.  The evaluator found that Plaintiff showed intact reality testing, and was calm, organized, and well-related.  (Tr. 336).  She was given a GAF score of 60 on that date, which indicates moderate symptoms.  (Tr. 338).  Plaintiff does not appear claim in her submission to the Court that the ALJ erred in not identifying her as delusional.

evidence.  (Tr. 19).  The ALJ rejected Plaintiff's claim that she had degenerative joint disease and fibromyalgia, as there was no evidence of an examination by Dr. Johnson that would support these diagnoses; she was reasonable in rejecting this opinion.[11]  (Tr. 15, 19-20).  See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)  (treating physician's opinion given controlling weight only where "well-supported by medically acceptable clinical and laboratory diagnostic techniques").

In addition, the ALJ found no evidence that any psychiatrist or psychologist had ever diagnosed Plaintiff with schizophrenia or treated her for it during the alleged period of disability, and the note contains no citation of a supporting psychological examination.  (Tr. 16, 19).  The ALJ did not err in giving more weight to the diagnoses from Plaintiff's psychiatric specialists than to Dr. Johnson concerning to her psychiatric problems.   See 20 C.F.R. §§ 404.1527(d)(5), 416.927(d)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

Plaintiff next cites a portion of the form Dr. Johnson filled out on December 31, 2006 in order for her to obtain a reduced bus fare because of her limitations.  (Tr. 275).  On the form, Dr. Johnson noted that Plaintiff had significant difficulty in walking more than one block and that she had significant difficulty in boarding or

---

[11]   Plaintiff claims in her Motion for Summary Reversal that she forgot to mention fibromyalgia at the hearing.  This is not true.  (Tr. 387).

    As noted in the Court's review of Plaintiff's medical history, Dr. Johnson also noted that Plaintiff had a history of degenerative joint disease on other occasions.  However, none of these are supported by an examination or explanation, and the Court finds that it was reasonable for the ALJ to reject these "diagnoses," as well.

leaving a standard bus.  Though the ALJ did not specifically mention this form, it does not indicate that the ALJ erred in her decision.  There is no evidence in the record that Dr. Johnson ever made a determination that Plaintiff was unable to walk on the basis of medical evidence.  Thus, the ALJ was entitled to disregard this isolated statement from Dr. Johnson.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(5) (treating physician's opinion given controlling weight only if well-supported).

### 3.    Plaintiff's Other "Diagnoses"

In her Motion for Summary Reversal, Plaintiff lists a number of medical and psychiatric conditions, which she alleges she has: fibromyalgia, hyperlipidemia, degenerative joint disease, hypertension, artereosclerosis, arthritis of the back left shoulder, anxiety, bipolar disorder, and arthritis of the back.  (Doc. 12 at 1-2).  The ALJ accepted that Plaintiff's generalized anxiety disorder, panic disorder without agoraphobia, arthritis of the spine, and arthritis of the left knee constituted a severe combination of impairments.  (Tr. 15).  The ALJ rejected Plaintiff's claims that fibromyalgia, degenerative joint disease, shoulder pain, difficulty in using her hands and arms, schizophrenia, and bipolar disorder impaired her ability to work.  (Tr. 15-16).  The Court has already discussed the ALJ's rejection of Plaintiff's alleged disability resulting from fibromyalgia, degenerative joint disease, shoulder pain, and schizophrenia in the context of Plaintiff's specific record citations, above, and there is no need to revisit the issue; the ALJ's decision that these did not cause disabling limitations is supported by substantial evidence.

The ALJ also specifically rejected Plaintiff's alleged bipolar disorder as a disabling impairment, and the Court finds no error in her decision to do so. (Tr. 16). The ALJ noted that only Dr. Ritterhoff had diagnosed Plaintiff with bipolar disorder, and that this was based on a single examination. (Tr. 16). Dr. Ritterhoff had not had the opportunity to develop a longitudinal picture of Plaintiff's impairments and limitations, unlike the other psychiatric specialists she had seen, who had not diagnosed bipolar disorder. When a physician has not seen a claimant long enough to develop a longitudinal picture, his opinion will not be given controlling weight. 20 C.F.R. §§ 404.1527(d)(2)(i), 416.927(d)(2)(i).

Plaintiff's citations of hyperlipidemia,[12] hypertension, and artereosclerosis, even if proper medical diagnoses, do not necessitate a reversal of the ALJ's decision. Plaintiff does not allege, and there is no indication in the objective medical record, how these cardiovascular diseases affect Plaintiff's ability to work. The issue for disability benefits is not whether a claimant has a disease, but whether that disease affects her ability to work. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). Where, as here, there is no evidence that a given disease has any effect on a claimant's ability to work, the disease cannot be relevant to the determination that the claimant is able to work.

---

[12]    According to 20 C.F.R. part 404, Subpart P, Appendix 1, "[h]yperlipidemia is the general term for an elevation of any or all of the lipids (fats or cholesterol) in the blood…The effects most likely to interfere with function are those produced by atherosclerosis (narrowing of the arteries) and coronary artery disease."

### 4.    The ALJ's Determination that Plaintiff Could Work

As noted above, once the claimant shows an inability to perform her past work, the burden shifts to the Commissioner, at step five, to show the claimant is able to engage in some other type of substantial gainful employment.  McNeil, 614 F.2d at 145.  Therefore, even though Plaintiff does not specifically challenge the ALJ's analysis at step five, the Court must find the ALJ's step five decision to be supported by substantial evidence in order to rule in the Commissioner's favor.

The ALJ found that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) & 416.967(b).  However, Plaintiff's RFC included several further limitations: only occasional climbing, bending, stooping, crouching, crawling, or kneeling; only unskilled work; and only occasional contact with co-workers or the public. (Tr. 18).  The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce the symptoms that Plaintiff alleged, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms was not credible.  (Tr. 19).  The ALJ found that Plaintiff's claim of disabling pain all over her body was not credible, as the record reflected that she frequently failed to mention this to her doctors.  (Tr. 19).  A credibility determination made by the ALJ will not be disturbed unless the finding is clearly erroneous.  See Imani v. Heckler, 797 F.2d 508, 510 (7th Cir. 1986).  The Court will not disturb the ALJ's credibility finding here.

The ALJ also found that Plaintiff's claimed degenerative joint disease and fibromyalgia were not supported by medical evidence.  (Tr. 19-20).  As discussed

above, the ALJ's determination here was not in error. Similarly, and as also discussed above, the ALJ rejected the medical records that indicated that Plaintiff suffered from schizophrenia, which the Court has already determined was not erroneous. (Tr. 19-20).

Further, reviewing the medical record, the ALJ found that the medical record showed that both Plaintiff's physical and mental symptoms were effectively controlled by medication. Notably, as to her mental symptoms, though Plaintiff complained of anxiety, she had been able to form relationships, was in touch with reality, and had most recently received a GAF score of 63, which indicates only mild symptoms. (Tr. 21-22). Though Petitioner claimed that she was unable to work, the record did not reveal any treating physician's opinion that she could not work. (Tr. 22). The ALJ considered the factors of 20 C.F.R. §§ 404.1529 & 416.929 and Social Security Ruling 96-7p, which concern the consideration of symptoms, including pain, in relation to the objective medical evidence, and found that Plaintiff's allegations of disabling symptoms and limitations could not be accepted. (Tr. 22). These findings were supported by substantial evidence.

The ALJ relied on the Vocational Expert's testimony, which was consistent with the information in the Dictionary of Occupational Titles, that there were jobs available in the Illinois and national economy that Plaintiff could perform despite her limitations. (Tr. 23). Though Plaintiff's attorney had elicited testimony from the Vocational Expert that certain limitations would eliminate these jobs, there was no evidence that Plaintiff had these limitations in the objective medical record, and

so the ALJ rejected these limitations. (Tr. 23). Her rejection of the attorney's hypothetical limitations was supported by substantial evidence.

### B.    Additional Evidence

Plaintiff submitted additional evidence to the Appeals Council after Plaintiff's hearing before the ALJ. (Tr. 7, 367-75). In addition, she attached records to her Motion for Summary Reversal and submitted her Motion to Submit Additional Evidence. (Docs. 12 & 15). Evidence submitted after the ALJ issued her decision is not part of the record for judicial review in this Court unless Plaintiff shows the evidence is new, "material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); Perkins v. Chater, 107 F.3d 1290, 1296 (7th Cir.1997). If the Plaintiff meets this burden, the Court may remand the case in order for the additional evidence to be heard. 42 U.S.C. § 405(g) (sentence six). It must first be noted that Plaintiff has failed to allege "good cause" for her failure to include this evidence into the record before the ALJ, and thus her implicit request for a sentence-six remand must fail. However, as Plaintiff is proceeding on appeal *pro se*, the Court will conduct the additional analysis of whether Plaintiff's additional evidence is "new" and "material."

Evidence is "new" if it "was not in existence or available to the claimant at the time of the administrative proceeding." Perkins, 107 F.3d at 1296. New evidence is "material" if there is a "reasonable probability" that the administrative law judge would have reached a different conclusion had the evidence been

considered.  Johnson v. Apfel, 191 F.3d 770, 776 (7th Cir. 1999).  Thus, to be material, the new evidence must relate to the claimant's condition "during the relevant time period encompassed by the disability application under review." Kapusta v. Sullivan, 900 F.2d 94, 97 (7th Cir. 1990).

First, several of the documents included in this "new evidence" predate ALJ's April 9, 2008 decision.[13]  (Tr. 370-375; Doc. 12 at 3-4, 7).  This evidence is not new, as it was "in existence or available to the claimant at the time of the administrative proceeding."  Perkins, 107 F.3d at 1296.  Therefore, the Court cannot grant a remand for consideration of this evidence based on sentence six of 28 U.S.C. § 405(g).

In addition to being "new," additional evidence must be "material."  42 U.S.C. § 405(g).  Several of the documents date well after the ALJ's decision, with the earliest being dated August of 2008.  (Doc. 12 at 5, 12; Doc. 15 at 2-5).  Therefore, they are not material, as they do not relate to Plaintiff's condition during the relevant time period, and they do not require a sentence-six remand.  Kapusta, 900 F.2d at 97.  If Plaintiff has developed additional impairments since the application for benefits at issue, she may file a new application.

---

[13]     In fact, the documents attached to Plaintiff's Motion for Summary Reversal were included in the records presented to the ALJ.  (Tr. 258-260).  Plaintiff may have attached these in order to bring them to the Court's attention as further objections to the ALJ's findings.  One of them is a November 30, 2007 progress note by Dr. Johnson, which was discussed above in the context of Plaintiff's particular citations to the transcript.  (Doc. 12 at 3; Tr. 260).  The other two relate to a left shoulder X-ray that Plaintiff had on January 11, 2008.  (Doc. 12 at 4, 7; Tr. 258-59).  As noted above, the ALJ considered Plaintiff's shoulder problems, including this X-ray, and found her allegations that her shoulder pain was disabling to be non-credible, which finding the Court will not disturb.  (Tr. 15-16, 20).

On the other hand, several of the documents date to a period within a few months of the ALJ's decision.  (Tr. 367-369; Doc. 12 at 6, 8-9).  It is conceivable that these might reflect Plaintiff's condition during the relevant time period.  However, these records are not material, as they do not raise the "reasonable probability" that the ALJ would have reached a different conclusion had the evidence been considered.  <u>Johnson v. Apfel</u>, 191 F.3d 770, 776 (7th Cir. 1999).

The first record (chronologically) is a progress note by a nurse on April 17, 2008.  (Doc. 12 at 8).  The nurse noted that Plaintiff complained of a burning sensation in her left shoulder and pain in her left rib.  There is no reasonable probability that the ALJ's decision would have been different if she had considered this record, as the ALJ did consider and take into account Plaintiff's complaints of pain.  The second document is the record of an MRI performed on Plaintiff's left shoulder on April 29, 2008.  (Tr. 367; Doc. 12 at 9).[14]  The radiologist notes his impression of "mild rotator cuff tendinosis/tendonitis, without tear identified."  He also ruled out Dr. Johnson's speculation of a humeral head rarefaction, finding that no abnormal signal intensity within the humeral head is seen to suggest a pathology of any kind."  (Tr. 367; Doc. 12 at 9).  Because the ALJ took Plaintiff's shoulder pain into account when making her decision, there is no indication that knowing the reason for the pain would change that decision.

Finally, on May 15, 2008, Dr. Johnson wrote on a "Permit to Return to Work or School" that Plaintiff "cannot lift more than 5 lbs, cannot stand for more than 15

---

[14]    The identical record was submitted twice, both as to this record and the May 15, 2008, record that is discussed below.

min or sit more than 15 min." (Tr. 386; Doc. 12 at 6). As noted above, a treating physician's opinion is given controlling weight only where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). This note does not indicate the medical evidence or examination that support's Dr. Johnson's opinion. Therefore, there is no reasonable probability that the ALJ would have relied on it to come to a different conclusion. Because none of the additional evidence cited by Plaintiff is "new" or "material," as well as because Plaintiff has not attempted to allege "good cause" for her failure to present it to the ALJ, it does not entitle her to a sentence-six remand. For the same reasons, Plaintiff's Motion to Submit Additional Evidence (Doc. 12) is denied.

### Conclusion

For the foregoing reasons, Plaintiff's Motion for Summary Reversal (Doc. 12) is DENIED, and Defendant's Motion for Summary Affirmance (Doc. 14) is GRANTED. Plaintiff's Motion for Leave to File Additional Information (Doc. 15) is DENIED.

IT IS SO ORDERED.


CASE TERMINATED.

Entered this 15th day of December, 2009.


s/ Joe B. McDade
JOE BILLY McDADE
United States District Judge